Good morning, everyone. And we'll call the first case, which is MaidenCreekAssociates etalv versus United States Department of Transportation etalv. And we'll hear first from Mr. Kaplan. Thank you, Your Honor. On behalf of MaidenCreekAssociates. That's correct. I'd like to thank you for your courtesy in switching the time around so I can get to Allentown this afternoon. I sincerely appreciate that. We understand the difficulties of travel. Thank you. You're welcome. The matter before you involves one issue. Who has standing to assert a violation of the National Environmental Protection Act, commonly known as NEPA? My client, MaidenCreekAssociates, owns a large parcel of property adjacent to State Highway 222. We are well aware of the facts, Mr. Kaplan. Are you content if we were to reverse the denial of the motion to amend, or are you going to defend your initial complaint as having satisfied either constitutional or prudential standing? I pondered that question, Judge Rendell. I think that we alleged adequately in the original complaint. How so? Well, we alleged what we thought were the environmental acts. First of all, Mr. Kaplan, before you answer that question, did you want to reserve some time for rebuttal? No, I don't. All right. Continue. Let me answer it this way, Judge Rendell. To the extent that the original complaint was deficient, the amended complaint, which is before the court, more than adequately laid out what we considered to be the effects or the issues, really the issues that needed to be looked at by PENDOT before it granted itself this environment. You're talking about the original complaint now. You're not talking about the proposed amended complaint. I'm sorry. I was talking about both of them. What I said, Judge Bowery, was to the extent that there's an argument that we weren't sufficient in our original complaint, the amended complaint contains more than enough allegations of the environmental impacts and the environmental questions that were raised. But aren't they pretty much speculative, as the district court found? They were generalized. I mean, if you had these impacts and you knew of them, why were they not averred in the initial complaint, if they're real and are a particularized injury to your client? Judge Rendell, we did not know of them. I spent a year with right-to-know requests, dealing with general counsel to get the materials. We had another action in the Commonwealth Court to force PENDOT to follow its own procedures. We did not know that they were going to condemn our property and build a detention basin or two detention basins on our property and dump their water from the road on our property until after we filed the complaint. They did not give us the plans. Similarly, they did not give us the studies, the traffic studies that their consultant had prepared. When we got the reports, they showed that there was going to be a backup of 1,500 feet of traffic. But traffic doesn't quite do it, does it, in terms of the environmental harm?  Well, if you're going to backup cars in front of our property at 1,500 feet each way, and for each 100 feet you've got four or five cars, you've got a large backup of cars. What case says that traffic safety or traffic alone satisfies the environmental injury? I haven't said that traffic alone satisfies the environmental injury. Why don't we start a little more at the basics? By what authority, under what authority, are you permitted to advance the potential interest and potential injuries to potential patrons of your shopping center? Well, I don't believe that that's what we're doing here, Judge Barry. You're talking about potential patrons. Well, no. I mean, this is not Society Hill where you had residents of the neighborhood. Can I answer the question? As I understand the National Environmental Protection Act, there is a duty on the part of the government actor to investigate certain designated areas of impact. And what we're complaining about is that they didn't investigate these areas of impact. In the categorical exclusion that was filed and is part of the record, there's a whole series of questions that I think answers your point. Okay, but the problem, Mr. Kaplan, with the argument that you're proposing, that you are putting out there, is that you have to establish standing to make that argument. And the question that's been asked here is how do you get that standing? How do you get the representational standing? Whether it's statutory, whatever you call it, statutory standing, prudential standing, constitutional standing, whatever. How do you get there to raise these questions? Okay, we have constitutional standing. We have Article 3 standing. That's been agreed to. The township has Article 3. How do you get statutory standing to represent the interests of the patrons, the potential future patrons who may come to your developed shopping center? No, I don't think that's our position that we're in a representational capacity. The township may be in a representational capacity. We're not. We're a property owner who owns 85 acres of property, not yesterday, but for years. Okay, there's no question about that. And you had a state court action contesting some of these questions. No, forcing PennDOT to give us the information. Okay, but here you're under the APA. Right. Okay, you're under the APA, and you're attempting to say that PennDOT, on behalf of the feds, did something wrong. The question I think you have to answer is how do you get here to ask that question? I understand, and I think I'm going to say the same thing again. We own a piece of property adjacent to the project. Our property is going to be condemned. They're going to put two big detention basins on our property where the water is going to come. The storm basins, just parenthetically, haven't even been designed yet, have they? I don't know whether they've been designed. They won't tell us. I think they've been designed when they finally gave us a joint. But that's my point, Judge Barry. They were under an obligation to investigate the effect of that storm water basin. They were under an obligation under NEPA to investigate the effect of putting 1,500 feet of traffic stopped in front of it. What's the environmental harm? How is the environment going to be harmed in a way that you will be injured? Well, I don't know whether the storm water management facilities will be properly designed in an exceptional value watershed. So you're saying any time a plan calls for a storm water basin or whatever, the bells and sirens should go off and a full EIS has to be performed? You know I've done that my entire career. Of course the answer to that. Is no, the bells and whistles shouldn't go off. I do that for my clients every day. But we have an unusual situation here. We have this act that says that there has to be an environmental investigation under this act. If you look at the questions, I ask you to look at the questions that are in the categorical exclusion that's in our appendix at page 9. It's interesting. That's a regulation. And there's a question in my mind as to whether that regulation actually would expand what the statute is designed to do. I mean, that includes the concept of relating to planned growth or land use. To my mind, the Supreme Court has read the statute much narrower than that to have to do with the world around us, the air we breathe, et cetera, the Metropolitan Edison case. I'm not sure that regulation really helps you because it might go beyond what the statute is designed to do. But that's the hand that we're dealt, Your Honor. Well, you say we're dealt. I return to my initial question. You're raising potential injuries to potential patrons of a shopping center. No. What authority are you here in federal court under? I never said that, Your Honor. I never in any of my briefs have said we're here representing our tenants. No, potential patrons. We never said that. You're expecting all these customers to come in. No, we never said that. It's not been said. My client owns a piece of property on which they're going to build this road. They're going to build this road. And the National Environmental Protection Act says that when federal money is going to be used to build something like this, a type of investigation must be made. And the investigation was not made. Instead, PennDOT, as the delegated agent of the Highway Administration, files with itself an application for categorical exclusion and two days later grants itself that. When you look at the answers to the questions, that if you look at the questions and the answers, I believe that these are the concepts that for whatever reason, Judge Rendell, that's what the Federal Highway Administration has said is the criteria. Okay, Mr. Kaplan. Thank you. Thank you very much. And we'll hear from Mr. Garrell on behalf of the Board of Supervisors. Good morning, Your Honors. May it please the Court, Christopher Garrell on behalf of Maiden Creek Township Board of Supervisors. I'd like to give you a background on the duties of the Board of Supervisors and additionally the layout of Maiden Creek Township as it pertains to environmental issues.  Why is the Township not a party? It seems that the Township is the affected entity, not the Board. If I may, Your Honor, the Board represents the constituents, which are essentially all of the approximately 9,500 individuals in the Township as well as property owners. To that end, MCA as well as surrounding property owners have an important insight on their properties and there could be potential impacts on their properties. Something my colleague did not mention is a property immediately adjacent behind MCA's property contains Peters Creek. That empties into Lake Onewanee, which is the water source for the City of Reading. So it is important to understand there are environmental issues relative to not only MCA's property but properties adjacent to MCA's property and the Route 222 corridor. But we turn to Judge Rundell's question. You are here effectively as the State. You are here representing the citizens of the town of Maiden Creek, are you? Yes, Your Honor. But even assuming that you are permitted to do that, you are barred as effectively the State from suing the Federal Government as parents' patriarch. The Supreme Court said so. I believe we are permitted underneath the associational standing test, which the Supreme Court has permitted, albeit in a different context. A big different context. And if you are representing, you are really representing all of the property owners, supposedly. You represent everyone. Are you saying everyone has sustained an injury, every property owner? Certainly not, but there is the potential for significant harm as Maiden Creek is laid out. The Route 222 corridor has the greatest volume of commercial development and also residential housing. The remainder of Maiden Creek Township is sparsely populated. So this is the main route that goes from Allentown to Redding, and it's the source of all the township commercial development. All right. I think we need specific allegations establishing that at least one identified member had suffered or would suffer harm. Can you satisfy that? I believe so, Your Honor. MCA as well as surrounding property owners will be directly impacted by this project. What's the harm? There are potential risks for increased groundwater contamination into Peters Creek and Lake Onewanee, as I've described. How would that come about? Well, with any change as the Department of Transportation has proposed, you have to consider these important issues. Yeah, but, you know, any change would take away the categorical exclusion. We have to have significant harm here, and we can't just have speculation that then requires, you know, a report to be prepared any time there's any change that would have any impact. It has to be significant, doesn't it? It does have to be significant, but it's difficult to allege specific harm before the project is completed or perhaps even contemplated at this point. Well, then maybe your suit's not right. And even if it is right, don't you also have to show proximate cause, that what you're complaining about is going to be the cause of the issues that you say are going to impact the residents of Maiden Creek? In our complaint and proposed amended complaint, I believe we have alleged sufficient injury as far as my colleague represented. But how do you establish proximate cause? Well, this is going to change two intersections, two very important intersections in Maiden Creek Township. There will be queues of cars approximately 15 feet, 100 feet in either direction. And the Teton Basins, as counsel indicated, may propose an issue. I mean, how's it going to change from what you would like to see done with the highway? I mean, the change is going to come about because you're going to have a development of a piece of land. That's going to be the change. I appreciate your question. And in our brief, we've actually indicated that MCA's development may exacerbate the problem. Exactly. But you're not suing MCA. You're suing PennDOT and the Highway Administration and saying you have a right to sue under NEPA. And it seems to me that the cases say that's all well and good, even if you're properly here representing somebody who's a resident of your township. You also have to show that what you're alleging they're going to do is going to be the approximate cause of your resident's injuries. I believe we've done that in our complaint and proposed amendment complaint. Okay. All right. Do you have anything else, Mr. Garrett? As far as the zone of interest of NEPA, I believe our alleged injuries, especially in the proposed amendment complaint, are well within the zone of interest, particularly in light of Clark v. Securities Industry Association, whereby in the context of the APA, the zone of interest test is, quote, not meant to be especially demanding. Furthermore, with regard to the issue of whether or not amendment of the complaint is futile, as counsel has indicated, many of the additions to the complaint, which were not contained in the original complaint, were because of after-discovered information as a result of right-to-know requests and documents which the Department of Transportation thoroughly produced subsequent to the filing of the original complaint. We believe the important environmental considerations contained in the proposed amendment complaint are enough to establish standing and such that amendment would not be futile. Okay. All right, Mr. Garrett, we thank you for your arguments. Thank you, Your Honors. We'll hear from Mr. Masonet on behalf of the U.S. Department of Transportation. Good morning, Your Honors. So the Pennsylvania Department of Transportation and the Federal Highway Administration are working to improve State Route 222 and make it safer. One of the changes they're going to make is they're going to put a traffic circle in front of MCA's property. Traffic circles reduce car accidents, and they reduce injuries from car accidents by preventing T-bone You're also going to have stormwater basin, which is going to have potential for problems with the water, the land, et cetera, et cetera. Right. And that seems at this point, Your Honor, based on what we've heard today, argument to be the last allegation left that MCA has. Have they been designed yet? My understanding is that they have not been designed yet, Your Honor. That was my understanding. They haven't even been designed yet. And the design process might well include some of the parade of horribles that your friends see. Right. And in addition to having to have to design and build these stormwater basins, they'll also have to be permitted under the Clean Water Act. As part of that process, a stormwater management plan will have to be written and approved, and MCA will be able to participate in that and comment on those permits. Although that's more MCA's problem than yours, because they want to proceed with a case that they're not going to be able to show the harm because they haven't been designed. So, you know, ultimately, if it doesn't get designed for a couple years, they'll probably be thrown out of court. Yeah, I suppose that's true. My understanding, and Ms. Garber can tell you a little bit more about the exact status of the project right now, is that the Clean Water Act permitting process is likely to begin in the next few months. Do you concede constitutional standing? We haven't disputed it, Your Honor. Do you think it is? I think they probably have constitutional standing. I think they, at least at this stage, at the motion to dismiss stage, I think their allegations are sufficient to show that they might suffer some economic harm from this project. One of the things that surprised me a little bit is when this case was decided in the district court, Lexmark had been decided by the Supreme Court. And notwithstanding that, apparently no one thought that Lexmark had any importance in this analysis. I think it does. It changes rather significantly, at least the label of the analysis and the type of analysis. Do you think the fact that the district court did a prudential standing analysis as opposed to the statutory standing analysis makes any difference to the outcome? Should we be concerned about that? I don't think so, Your Honor. I mean, to the extent that Lexmark changed the terminology and shifted perhaps the focus of this analysis away from general concepts of standing to more towards statutory interpretation, I think the district court grappled with those issues in its decision and focused on, for example, the question of whether or not economic injuries fall within NEPA's zone of interest. And that issue was briefed before the court. Post-Lexmark, this is not a jurisdictional analysis. It's really a question of whether or not the parties have, it's a 12B6 analysis. Yes. Why does the amended complaint not satisfy prudential standing? Well, I think it's worth noting first, Your Honor, that there are a lot of allegations of environmental injuries in the amended complaint. Allegations of air pollution and groundwater contamination and the flooding that we've discussed here today. Now, of course, none of those were in the original complaint and none of those were in the series of letters that MCA sent to PennDOT complaining about this project. But that's the whole point of amending a complaint, is that you can then satisfy whatever deficiency there was, and they've done that, and presumably they have a basis for that, or there'd be sanctions for filing a complaint that they have no basis for believing the allegations. But how does it not satisfy standing? So two fundamental problems, Your Honor. First, a lot of these allegations don't deal with their own environmental interests. Well, there's one that talks about aesthetic, et cetera, but most of them have to do with the problem to their own land. Well, I don't think that's entirely true, Your Honor. There are a lot of allegations about potential patrons and the air pollution and the groundwater contamination. What they fail to do is tie that to MCA's or the board's interests. I mean, we've heard here today about Peters Creek. What interest does MCA have in Peters Creek? What interest does the board have in Peters Creek? Maybe there's a generic season. Let's say that they only alleged that it would result in additional stormwater runoff that would contain petroleum and other potential groundwater contaminants, which would be directed to and deposit into the stormwater basins proposed to be located on MCA's property. Right. Let's assume that's the only allegation. Now, it isn't. There's about six or seven allegations. But let's assume that's the only allegation. Doesn't that get them past? No, I think there are still two problems with that specific allegation, and I agree. That's the allegation that gets them closest to the hurdle they had to get over to bring this case. Two problems. One, which the court has already touched on, they needed an allegation of injury that was concrete and actual or imminent and particularized. And this doesn't satisfy that. The stormwater basins, this is part of the overall plan, but they haven't been designed. They haven't been built. There's a long chain of events that would have to happen to lead to flooding on MCA's property, and it's just entirely speculative that the basins are going to be designed wrong, that they're going to be permitted wrong, that a bad stormwater management plan is going to be designed, that MCA, even though it can participate in this process, won't be able to get those concerns heard and the agencies will build these things. It's a motion to dismiss. We don't know all these other facts. The court doesn't know all these other facts when you have the motion to dismiss. Correct? I mean, we ask the questions and we know the answer, but we can't really use that as a basis for an opinion. Well, I think to test the nature of the injury and whether it's actual or imminent, I think the court can look to the regulatory process that's before these things. But even assuming that this was a concrete injury that they had alleged, it's still fundamentally an economic injury. Let's assume that MCA's property will be flooded. What's MCA's interest in that? Its interest is economic. Its interest is in the value of its property. Well, contaminated water. Contaminated groundwater is not just economic. It's classic environmental injury, is it not? And no doubt there's some point of summary that might have an interest in it, but what is MCA's interest in contaminated? If I've contaminated water on my property, don't I have standing to complain about it and say you really need to investigate? But isn't that an economic injury? I think it's air, land, water, which the Supreme Court has said. I mean, if it were only that it's going to drive away patrons or it's going to cost them money, yes. But that's not the allegation. How do you distinguish this case from the Eighth Circuit decision and the Friends of the Boundary Waters? Yeah, Friends of the Boundary Waters is an interesting nuance in this body of law. As the zone of interest test applies to the National Environmental Policy Act, we're at the threshold of NEPA, right? The agencies did a categorical exclusion. They did not prepare an environmental impact statement. There are several cases where plaintiffs with economic interests were able to maintain suit because the obligation to prepare an environmental impact statement had already been triggered. And once the agency has to prepare an environmental impact statement, it has to look at certain social and economic effects. Now, those by themselves don't trigger the obligation to prepare an environmental impact statement. But once it has to do that, then economic actors can come in and say, look, you did this EIS and it doesn't consider our economic interests. So it's the adequacy of the EIS as compared to the initial. And the Eighth Circuit said as much in subsequent cases. It's clarified that the holding in Friends of the Boundary Waters v. Dombeck, I'm sorry, it says in Boundary Waters v. Dombeck itself, that that is not true when the threshold applicability of NEPA is at issue. Okay, but in a way, you know, this is an APA case. This suit was brought under the APA. Yes. The zone interest analysis is under NEPA. If you're reading the Eighth Circuit case the way you are, then why wouldn't it be easy for all the state transportation agencies to just say, we're only going to analyze this under a categorical exclusion. We're not going to bother getting into the environmental impact statement because the adjacent landowners and townships can ask more questions. It doesn't make sense that they can't challenge somehow the decision to do less as opposed to doing more. And we're not saying that that's the case. We're saying that NTA can't do that. Who could? A citizen of Maiden Creek who likes to walk Route 222 and appreciates the aesthetic environment and thinks it's going to be harmed by this project, those allegations might very well withstand a motion to dismiss at this stage. The burden is not heavy. Well, isn't the Board of Supervisors properly here on behalf of that citizen? Well, first of all, as the court's already pointed out, the Board of Supervisors can't proceed parents patriae against the state of Pennsylvania and the United States because we also represent those citizens whose lives we're trying to protect. Yeah, but they're coming in under the APA. They're saying, wait a minute, this should have at least done an environmental impacts study. Right. Again, I don't fully understand what legal authority the Board of Supervisors has and who exactly it represents. Well, they can sue or be sued. I know the township can, but they're not the township. And the district court found it implausible that the board has associational or representational standing for the citizens. But anyway, all they needed to do was get one named citizen. If one of the members of NCA, which is a partnership, had a cookout each Sunday on this property and brought his family and liked the view and thought it would be spoiled by this, maybe that would have been enough. But they just haven't connected the dots, Your Honor, from this project to a harm to their own environmental interest that's real and concrete in that point. What do we do with the phrase in the categorical exclusion, relates to planned growth or land use, that the categorical exclusion cannot be used if what's proposed relates to planned growth or land use? I mean, wouldn't the initial complaint satisfy that? Well, you know, I don't have any – whether their merits challenge has any validity to it at all, it's not really relevant except they don't have the standing. Well, from a standing standpoint, we need to kind of look at what they're alleging. And if they're alleging something that relates to planned growth or land use, which the original complaint did, isn't that enough to say the categorical exclusion doesn't apply? You know, this is a straightforward $14 million safety improvement that will expand this road and put in traffic circles to improve the safety of the highway and a lighted intersection. It seems to me it's exactly the sort of thing that the categorical exclusion was designed to do, the modernization of a highway. Okay. Mr. Mason, thank you very much, and we'll hear from Ms. Gardner. Thank you, Your Honor. Good morning. My name is Kendra Gardner, and I represent the Pennsylvania Department of Transportation. I'd first like to turn to some of your questions that you've asked other colleagues, the one being the stormwater, flooding, groundwater issue. This project is going to require a number of permits. It's going to require an NPDES permit. It's going to require a Section 404 permit both under the Clean Water Act, and then it's also going to require some state environmental permits. How does that impact what we're looking at today? We're looking at a pleading to decide whether there is a constitutional or prudential standing to pursue this case. What does the permitting have to do with it? Well, in my opinion, that is the proper forum for raising those issues. Will NCA and the Board be able to have input into the permitting process? Absolutely. There will be several comment periods, public comment periods, where they will have opportunity to present comments. In addition, there are requirements in these permitting processes that require the post-construction stormwater management plan, which is the plan that has the basins in it, to be submitted to the township for review for consistency with its stormwater ordinances. That's all well and good, but the statute imposes on the government the obligation to prepare an environmental impact statement so that it comes forward with a statement about the impact, and it has studies and it can present this and do its homework so people can intelligently comment. Otherwise, if we don't have this kind of statement, you're kind of shooting in the dark, are you not? Because the government has this information, and the question is whether they need to prepare this statement. It seems to me the permitting process is all well and good, but to inform the permitting process, that's why we would have an EIS, unless there's absolutely no significant impact, and then the categorical exclusion would apply. There are sections of the categorical exclusion that talk about the potential for stormwater runoff and that these permits will be obtained. These permits, NEPA is a procedural statute. It requires informed decision-making, whereas these other statutes are substantive. And the categorical exclusion doesn't apply if it relates to planned growth or land use, and hasn't that been averred in the complaint that has to do with upset the development plan for this entire area? Hasn't that been alleged? They have generally alleged that, yes, that it's inconsistent with planned use. However, if you turn to 40 CFR 1508.15, which is the Council on Environmental Quality's regulations regarding NEPA, it says that socioeconomic reasons alone cannot be a reason to require an environmental impact statement, and that interest is a socioeconomic interest. Okay, that's in the original complaint, but how about the amended complaint? How does that not pass muster from an environmental standpoint? From an environmental point of view, the air, traffic, and stormwater injuries that they've alleged are very general, speculative. The exhibits that they refer to in their amended complaint, for example, they support the queuing of traffic as the reasons for the air and the noise. However, the exhibit B relates to traffic analysis, including their project. So it's not our project that's necessarily causing that degree of queuing. It is their project, their development. In addition, they added some environmental buzzwords to their amended complaint,  At the outset, this was an economic case with a few allegations of traffic safety, and this is the fallback now. We've got some now, whether they're just speculative or whether there's any kind of right for them to speak on behalf of potential patrons and citizens of a town that's not even a party is another question. Well, I think you really need to look at they've been involved in the NEPA process. They've submitted comments. None of the comments raise any environmental issues. It's all traffic, how it's going to affect their ability to develop. The township adopted a resolution. That resolution opposes the project, but it's based on access to commercial development and their concern over their potential impacts to their tax base. So in looking at their alleged environmental harms, you need to look at what they've been alleging this whole time. They are sophisticated appellants. They deal with development all the time. They know about air, noise, and stormwater impacts. They don't need to receive a plan that says there's going to be some best management practices on this project. They know that best management practices are going to be a part of this project. So they are sophisticated appellant, and they should have known if they had these real concerns, they would have known about that when they filed the first complaint. Now I asked Mr. Masonette about, didn't it seem strange that the 8th Circuit said you could challenge an EIS, but here where PennDOT chooses to file for their own approval as a categorical exclusion, no one could challenge it. He said, well, a citizen could. How do you distinguish that citizen from the Board of Supervisors? Aren't they here representing that citizen? Don't they have a right under the Second Class Township Code to represent that citizen? They haven't submitted any affidavits or anything to point to specific citizens or businesses that would be impacted. And therefore, their alleged injuries... Do they have to? I mean, we're at a 12B6 stage. They alleged it in the complaint. In my experience in matters like this, there's always been attached affidavits alleging specific injuries to members, because they're representing a group and they have to point to specific citizens. It just seems rather odd that NEPA didn't contemplate somebody like a township being able to come in and say, hey, PennDOT, you shouldn't just be able to say, this is a categorical exclusion. We don't have to do anything else to move forward. Because, in effect, a PennDOT decision on the width of a highway and the configuration of a highway can have a major impact on the future steps that a township and landowners will take. And if this isn't challenged at the front end, the input on permits is going to be of little benefit to the community. Well, we did have a number of meetings with the township and we also had a number of public meetings prior to issuing the NEPA decision. And they obviously, those meetings didn't lead to agreement or we wouldn't be here today. With regard to projects, it's hard to get a unanimous decision from all the citizens and you try to do the best as far as for the public interest. And in this case, this is a stretch of roadway that has a history of safety concerns. A number of fatalities have occurred in this stretch of roadway. So basically the bottom line is standard intersection or roundabouts. That is what appellants are concerned about. They don't like roundabouts. Nobody likes roundabouts when they come into their neighborhood because it's different. And in this case, roundabouts, they lessen the number of accidents and they also lessen the severity of injuries resulting from what accidents do occur in addition to the fact that they handle the congestion. Okay. All right. We understand your position, Ms. Gordon. Okay. Thank you very much. And we thank all counsel for a job well done and we'll take this case under advisement. Thank you.